UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America, | Criminal No. 3:11cr1 (JBA) |
| *v.* | |
| Joseph Reyes and Richard Daniels, *Defendants.* | August 29, 2012 |

RULING ON DEFENDANTS' MOTION FOR A MISTRIAL

On August 21, 2012 Defendant Reyes moved orally [Doc. # 520] for a mistrial as a
result of the Government's solicitation of testimony from a cooperating witness regarding
an alleged incident in which Mr. Reyes shot a gun at him. On August 22, 2012, Defendant
Daniels moved orally [Doc. # 522] to join this motion. For the following reasons, Defendant
Daniels's motion for joinder is Granted, and Defendant Reyes's motion for mistrial is
Denied.

I.      Factual Background

In March 2012, Defendants in this case moved to preclude evidence of their gang
affiliation. [Doc. ## 423, 424, 432]. In its opposition to these motions [Doc. # 431], the
Government indicated that it intended to solicit testimony from a cooperating witness that
Defendant Reyes shot at him during an altercation with several members of the alleged
conspiracy. (Gov't's Opp'n [Doc. # 431] at 6.) Defendant Reyes objected to the admissibility
of this evidence in his Reply [Doc. # 452] on the basis that it was irrelevant and unduly
prejudicial. The Court denied Defendants' motions to preclude, holding that evidence of
gang affiliation was admissible, without specifically addressing the admissibility of the
alleged shooting incident. (*See* Order Denying Motion *in Limine* [Doc. # 454].) During the

August 1, 2012 pretrial conference, counsel for Defendant Reyes raised the issue of this evidence with the Court:

> However, something that was a little unclear to me relates to bad act evidence, or whatever the government may be calling it, if they choose to bring it up.  There are some allegations, and I think some of this was referenced in the motions that I'm not sure Judge Kravitz addressed directly . . . there have been references to shootings, one of which I think resulted in a death, and I believe the government has said that they intend to attempt to get that material before the court, and I don't know if now is the best time to move, but I thought I should mention it.
>
> I really do think we need to know beforehand, especially about the death of a woman or any other shooting that resulted in injury or death or shootings in general.  If the government has a plan for interjecting that evidence, we've not been put on formal notice, to my knowledge, of any of bad acts evidence coming in.

(Pretrial Conf.  Trans.  at 37–38.)  The Government confirmed that no 404(b) notice had been given to the defendants (*id.* at 38), and stated:

> So, with respect to the shootings of other human beings, no, we're not planning to elicit any information about any of these defendants shooting another human being or killing another human being or any of their co-defendants doing that.  There's testimony that will come in about defendant Ramos firing a gun, not at anyone, but firing a gun, and there is plenty of testimony about the possession of weapons during the course of the conspiracy and, in fact, in furtherance of the conspiracy.  But as far as assaults with firearms or homicides, there's nothing.

(*Id.* at 39.)

During the defendants' trial on August 21, 2012, the Government solicited the following testimony from a cooperating witness:

> Q:     [D]id you get into an altercation at some time—withdrawn.  At some point between August 2010 and January 2011, did you get into an

altercation with Mr. Reyes and Mr. Ramos?

A:  Oh, yes.

Q:  Okay, and without going into the details of why you got into that altercation with them, just explain to the jury what happened.

A:  I was talking to Rattle about a situation, and we ended up having an argument. It was him, Fat Joe[1] and Cuda was out there. We proceeded to argue. Rattle picked up a milk crate and was hitting me with the milk crate, and I was blocking it, but I never hit him back. He just was drunk and hitting me with the crate. I was also drinking. We was both loud and you know it got kind of heated. That's when Fat Joe walked off, and Cuda and me and Rattle were in almost in a fight. Fat Joe came back about five minutes later, he had a handgun, one of the guns that was in the pictures. He get about maybe to where the jury booth is toward me and he shot at me.

Q:  You didn't get hit?

A:  No, the bullet went through my shoe and ricocheted through my shoe off the ground and just kept going, I guess.

Q:  When you indicate Mr. Reyes shot at you, were Cuda and Rattle near you as well?

A:  They kind of seen him walking up. We all kind of seen him. So, they kind of backed up, because we all saw him with the gun. So, I was just stuck right there, and that's when he just shot at me.

(Tr. Trans. Vol. II at 507–08). Counsel for Defendant Reyes did not contemporaneously object to this testimony. However, immediately after this testimony was given, the Court excused the jury, as it was the end of the day. (*Id.* at 509). Once the jury left the courtroom, counsel for Defendant Reyes orally moved for a mistrial based on this testimony. (*Id.* at 509–10).

On August 22, 2012 the Court struck from the record this witness's testimony regarding the alleged shooting, and admonished the jury, before they heard any additional evidence, that this evidence was excluded as irrelevant as to any count and they therefore were not to consider this testimony for any purpose. The Court's curative instruction was as

---

[1] Fat Joe was one of Defendant Reyes's nicknames. (Tr. Trans. Vol. II at 448).

follows:

> Good morning, ladies and gentlemen.  Please be seated.  Before we continue with the testimony of [the cooperating witness]—actually we're going to have another witness who is short and has time problems go before we pick up again with [the cooperating witness].  I wanted to give you a limiting instruction.  You remember at the beginning I told you that there would be—there may be evidence that's offered for a limited purpose, that I would tell you what the limited purpose was, and that if I tell you to exclude and not consider evidence, it's no longer evidence.  So this is one of those instructions.  You heard yesterday testimony from [the cooperating witness] about an altercation sometime between August 2010 and January 2011 that involved [the cooperating witness], Mr. Ramos and Cuda.  You heard testimony about Rattle, Mr.  Ramos, picking up a milk crate and hitting [the cooperating witness], and then you heard testimony in the context that [the cooperating witness] explained that Ramos was drunk, and he was also drinking, "we were both loud," it got heated, and that Mr.  Reyes came back and fired a handgun into [the cooperating witness's] shoe.  I am telling you—I am striking that testimony and telling you to exclude it because it does not bear on the issues that are before you.  It doesn't bear on the existence of a conspiracy to possess with intent to distribute, it doesn't bear on the thousand—conspiracy to maintain a premises, drug premises within the thousand feet of the school and housing project, it doesn't bear on the weapons charge against Mr.  Reyes.  Because of that, I am striking it.  I am telling you to disregard it.  It just is not part of the evidence in this case.

(Tr.  Trans.  Vol.  III at 535–37.)

II.     Discussion

"Courts have the power to declare a mistrial whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v.  Klein*, 582 F.2d 186, 190 (2d Cir. 1978) (internal quotations and citations omitted).  However, that power "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes and in the exercise of sound discretion." *Id.* (internal quotations and citations omitted).  "[A] mistrial

4

is warranted only upon a showing of actual prejudice." *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004) (citing *United States v. Abrams*, 137 F.3d 704, 708–09 (2d Cir. 1998) (per curiam)).

The Second Circuit has recognized that the improper admission of testimony may be addressed with a curative instruction to the jury, rather than granting a motion for mistrial. *See United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) ("Where an inadmissible statement is followed by a curative instruction, the court must assume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant." (internal quotation marks and alterations omitted)).   For example, in *United States v. Espinoza–Mora*, 205 F. App'x 886 (2d Cir. 2006), the Second Circuit found that a mistrial was not warranted where a co–conspirator testified at the defendant's trial for conspiracy to distribute cocaine that the defendant had dealt cocaine on other occasions. *Id.* at 891–92. As was the case with [the cooperating witness's] statements at trial,  the defendant in *Espinoza–Mora* had not previously been given notice that the Government intended to solicit this testimony.   The Second Circuit held that because the district court had given "an appropriate limiting instruction, striking that testimony from the record and instructing the jury to disregard it," there was no prejudice to the defendant that would warrant a mistrial. *Id.* ("[I]n light of the extensive evidence properly offered during trial of [the defendant's] involvement in cocaine dealing, we do not think it at all likely that the effect of the witness's blurted testimony would be devastating.")

Similarly, in *United States v. Vita*, 294 F.2d 524 (2d. Cir. 1961), the Second Circuit held that the improper admission of testimony regarding a defendant's prior participation in drug trafficking and bank robbery was properly cured by the district court's instruction that the testimony be striken as "irrelevant and incompetent," and did not warrant a mistrial. *Id.* at 526–27. ("The instruction to the jury to disregard the remark was clear and unequivocal. In the absence of any showing that the prosecu[]tor anticipated or induced the prejudicial statement, the warning to the jury cured the error. . . . The admissible evidence of [the defendant's] guilt was substantial, and it is unlikely that [the witness's] mention of [the defendant's] other activities played any role in the jury's return of a guilty verdict."); *see also United States v. Anzalone*, 626 F.2d 239 (2d Cir. 1980) (finding that the denial of the defendant's mistrial motion based on the admission of testimony regarding the defendant's prior criminal conduct to rebut an entrapment defense that the defendant had not clearly raised was proper where the court instructed the jury to disregard the offending testimony).

Even though this testimony in its fuller context may in fact have had relevance to the gang relationship that forms part of the Government's conspiracy theory, the cooperating witness's testimony that Defendant Reyes shot at his feet contravened the Government's representation that it would not offer evidence relating to "any of these defendants shooting another human being." Any prejudice to the defendants arising from the surprise introduction of this testimony was, in the Court's view, adequately remedied by the Court's action striking the testimony and issuing a limiting instruction to the jury. While admittedly prejudicial, this testimony was hardly the only firearm evidence related to the defendants introduced to the jury. Photographs of Defendant Reyes brandishing firearms were properly introduced and admitted absent objection. (*See* Gov't's Exs. 108–12.) There was extensive

6

testimony from witnesses who saw Defendant Reyes with firearms at 105/107 Johnson Street where drugs were trafficked.  There was also testimony that Defendant Reyes allegedly used a straw purchaser to obtain two firearms, one of which forms the basis for Count Three.  Thus, this testimony would hardly be so extremely prejudicial as to warrant a mistrial.  This is especially the case in terms of prejudice to Defendant Daniels, who was not even present during the shooting incident described by the cooperating witness.  Defense counsel has also acknowledged that the Government's solicitation of this testimony was not in bad faith, and was rather based on some confusion as to which shooting incident was being referenced during the discussion at the pretrial conference.

Furthermore, there was extensive evidence presented to the jury tending to establish Defendants' guilt.  The jury listened to dozens of wiretaps in which the defendants discussed potential drug sales, the operation of 105/107 Johnson Street, and gang business, including wiretaps in which Defendant Reyes discussed the purchase of firearms.  The jury also heard testimony from several cooperating witnesses regarding the organization and daily operation of the narcotics distribution enterprise at 105/107 Johnson Street and Defendants' roles in that enterprise.  This evidence was further corroborated by law enforcement testimony regarding the investigation and the contraband seized from 105/107 Johnson Street, Defendant Daniels's home, and from the homes of other alleged co-conspirators.  The risk that the jury would find the defendants guilty based on the striken testimony regarding the shooting incident is substantially reduced given the significant amount of admissible evidence of guilt before the court.  *See Espinoza–Mora*, 205 F. App'x at 891–92; *Vita*, 294 F.2d at 526–37.

Moreover, the Court acted as quickly as possible to instruct the jury to disregard the challenged testimony.  Mr. Johnson's testimony was striken from the record as soon as trial

reconvened the next morning, before the jury had heard any additional evidence. Furthermore, this evidence was presented on the second day of trial, leaving several days for any impression it left on the jury to wear off before they began deliberating. The Court struck the testimony in its entirety and carefully explained to the jury that the evidence was irrelevant, and why, as to each count before them. (Tr. Trans. Vol. III at 18–19). The Court saw no indication that the jury would be unable or unwilling to follow such detailed instructions. *See Elfgeeh*, 515 F.3d at 127.

III.    Conclusion

For the reasons discussed above, Defendant Daniels's oral motion [Doc. # 522] for joinder is GRANTED, and Defendant Reyes's oral motion [Doc. # 520] for a mistrial is DENIED.


IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of August, 2012.