UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America,<br><br>*v.*<br><br>Joseph Reyes and Richard Daniels | Criminal No. 3:11cr1 (JBA)<br><br>February 19, 2013 |

**RULING ON POST–TRIAL MOTIONS**

On August 29, 2012, Defendants Richard Daniels and Joseph Reyes were convicted by a jury of conspiracy to distribute and to possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 841(b)(1)(A)(i), 841(b)(1)(A)(iii) and 846 (Count One), and conspiracy to maintain a drug–involved premises within 1000 feet of a public housing facility, in violation of 21 U.S.C. §§ 846 and 860 (Count Two). (*See* Jury Verdict [Doc. # 544].) With respect to the narcotics distribution conspiracy, the jury found that the quantity of drugs involved in the conspiracy that was reasonably foreseeable to Defendants was one kilogram or more of heroin and 280 grams or more of cocaine base ("crack cocaine"). (*See id.*) Defendant Reyes was also convicted of possession of a firearm—a Taurus .40 caliber handgun, Model PT140—by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Three). (*See id.*)

Defendant Daniels now moves [Doc. # 553] pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on both conspiracy counts, arguing that there was insufficient evidence as to the existence of a conspiracy or his membership in the alleged conspiracy to distribute narcotics and to maintain a drug–involved premises, and that there was insufficient evidence as to the quantity of heroin that was reasonably foreseeable to him. Defendant Reyes moves [Doc. # 567] pursuant to Federal Rules of

Criminal Procedure 29 and 33 for a judgment of acquittal on all counts or, in the alternative, for a new trial, on which his grounds reprise his arguments that there was insufficient evidence as to his membership in the charged conspiracy or that it was the object of the conspiracy to distribute one kilogram or more of heroin, bolstered by his arguments previously raised in his motion [Doc. # 510] for a mistrial regarding the inadvertent introduction of evidence of a shooting incident.  For the following reasons, Defendants' motions are denied.

## I.      Legal Standard

"A Rule 29 motion [for a judgment of acquittal] should be granted only if the district court concludes there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotations omitted).  The Court must view the evidence presented at trial in the light most favorable to the Government, and draw all reasonable inferences in its favor." *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008).  "[I]t is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* at 99 (quoting *United States v. Guandagna*, 183 F.3d 122, 129 (2d Cir. 1999)).  "The Court must give full play to the right of the jury to determine credibility." *Id.*  "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotations and citations omitted).

Under Federal Rule of Criminal Procedure 33, the Court has the discretion to grant a new trial "if the interest of justice so requires," particularly where there is "a real concern that an innocent person may have been convicted." *United States v. Canova*, 412

F.3d 331, 349 (2d Cir. 2005).  "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses," *Cote*, 544 F.3d at 101, but "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  While courts have broader discretion to grant a new trial under Rule 33 than to grant an acquittal under Rule 29, "courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary of circumstances." *Id.*

## II.   Discussion

### A.   Motion for a Judgment of Acquittal

Defendants Reyes and Daniels both move for a judgment of acquittal on the grounds that there was insufficient evidence for the jury to conclude beyond a reasonable doubt that they joined a conspiracy to distribute narcotics and to maintain a drug–involved premises, and that the quantity of narcotics involved in that conspiracy was one kilogram or more of heroin and 280 grams or more of crack cocaine.

#### 1.   *Existence of the Conspiracy and Membership in the Conspiracy*

The Third Superseding Indictment [Doc. # 349] alleges that Defendants and their co–conspirators entered into a single conspiracy to (1) distribute narcotics (Count One), and (2) to maintain 105/107 Johnson Street as a drug–involved premises (Count Two). Defendants Reyes and Daniels argue, however, that while the Government may have established that there were multiple conspiracies in which individuals charged in the indictment sold their own narcotics out of 105/107 Johnson Street, the evidence presented at trial was insufficient to prove the existence of an overall conspiracy to distribute heroin and cocaine base at that location on behalf of the group, and to maintain 105/107 Johnson as a drug–involved premises, or to show that Defendants Reyes and

Daniels joined such a conspiracy. Defendants Daniels and Reyes argue that, at most, the Government presented sufficient evidence to show that they each distributed their own supply of narcotics from the same location. Defendant Reyes also raises the argument that he could not have conspired to "maintain" 105/107 Johnson Street because the home was occupied by several tenants who were not affiliated with the gang, and Defendant Reyes did not live there.

"To determine whether the government sufficiently proved the indicted conspiracy when the defendant claims that the government used multiple, distinct conspiracies to prove one conspiracy, [a c]ourt focuses on what agreement, if any, the jury could reasonably have found to exist vis–a–vis each defendant." *United States v. Hamilton*, 323 F. App'x 27, 29 (2d Cir. 2009) (quoting *United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995)) (internal quotation marks omitted). "To do this, [a c]ourt first reviews the scope of the criminal enterprises actually proven at trial to evaluate whether any of them fits the pattern of the conspiracy alleged in the indictment." *Id.* (quoting *Johansen*, 56 F.3d at 351) (internal quotation marks omitted). "Second, [a c]ourt weighs the defendant's conduct and statements to determine whether a jury could reasonably infer that he participated in the alleged enterprise with a consciousness of its general nature and extent." *Id.* (quoting *Johansen*, 56 F.3d at 351.)

Despite Defendants' arguments that the evidence showed only that each individual sold his own supply of drugs to his own customers at 105/107 Johnson Street, there was sufficient evidence presented at trial from which a jury could have inferred that there was a single conspiracy to operate 105/107 Johnson Street as a drug–involved premises and to distribute cocaine base and heroin from that premises. Specifically, the Government's evidence at trial tended to show that the co–conspirators dominated a

portion of 105/107 Johnson Street, primarily the front porch and the kitchen, as the base of distribution for their narcotics distribution scheme, and that they controlled the activities within that location.   The jury heard testimony that both Mr. Daniels and Mr. Reyes, along with the other co-conspirators, were members of the Sex Money Murder gang, which sold heroin and crack out of 105/107 Johnson Street.   (*See, e.g.*, Trial Tr. ("Tr.") at 429–30, 433, 439, 442, 446, 502, 987–91.)   The members of the gang sold crack and heroin from 105/107 Johnson Street every day, (*see id.* 436–37, 442, 446, 470, 502–04, 989–91), and stored their narcotics in several locations within 105/107 Johnson Street when they were not engaged in a sale (*see id.* at 495–98; Exs. 128, 130, 138).   Members of the gang also provided free drugs to the residents of the house to have them test the quality of the drugs being sold.   (*See* Tr. at 451–53, 1000–02)   The jury could have reasonably inferred that members of the gang also provided these narcotics free of charge in exchange for the use of 105/107 Johnson Street as a base of operations for their distribution enterprise.   Furthermore, cooperating witnesses testified that the gang determined who was permitted to sell drugs from this location.   (*See id.* at 435, 454–55, 499, 605–06.)

This level of control is sufficient to establish that a single conspiracy existed, and that the members of that conspiracy "maintained" 105/107 Johnson Street as a drug–involved premises, as charged in Count Two of the Third Superseding Indictment.   *See United States v. Snow*, 462 F.3d 55, 71 (2d Cir. 2006) ("Nor is evidence required that [a defendant] actually lived at the premises; all that is required is that he have 'opened or maintained' it."); *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010) ("To satisfy the 'maintaining' element of the statute, it is not necessary that the defendant lease or own the home"); *Morgan*, 117 F.3d at 857–58 (5th Cir. 1996) (finding evidence that

defendant exercised a supervisory role at an apartment over a duration of several months, stored his drugs at the apartment and referred to the apartment as "our spot" was sufficient to show he maintained it and directing courts to be "mindful of the conditions under which crackhouse operations are often conducted.  Drug dealers who maintain a location for the purpose of selling drugs may not avoid conviction under the crackhouse statute by simply ensuring that the lease or deed for the location and the utilities, if any, are not in their name.").

In addition, with respect to the drug distribution conspiracy count, the narcotics sold at 105/107 Johnson Street by gang members was packaged in a similar manner (*see* Tr. at 454–55, 1004–05), and was frequently sold under the same "brand names"—e.g., Take Over, Max Pain (*see id.* at 456, 1005).  The jury also heard testimony that the members of the gang worked together in the distribution of narcotics.  When new customers came to 105/107 Johnson Street, the members of the gang would rotate who got to make the next sale.  (*See id.* at 494.)  Occasionally, one member of the gang would sell drugs from 105/107 Johnson Street on behalf of another member.  (*See id.* at 1064; Ex. 55.)  The Government also presented evidence that the more senior members of the gang would sell larger quantities of drugs to other members of the gang to break up and sell to their own customers.  (*See* Tr. at 473, 476; Exs. 72, 76–77, 93.)  One member of the gang, Angel Millan, stored narcotics and guns for other members of the gang at his house near 105/107 Johnson Street.  (*See* Tr. at 1026–27, 1057; Ex. 60.)  The gang also held meetings, called "moons" to discuss gang business. (*See* Tr. at 1047; Ex. 72.) Furthermore, there was testimony that the gang worked together to avoid detection by law enforcement officers. For example, gang members used code when speaking with each other, such as "shwammys" for guns, "dog food" or "paper" for heroin, and "plastic" or "hard" for crack

cocaine.  (*See* Tr. at 463, 459, 1007, 1010, 1019.)   On at least one occasion, Defendant Daniels warned Defendant Reyes that ATF officers were watching 105/107 Johnson Street.  (*See id.* at 1041–42; Ex. 49.)   This evidence, taken together, was sufficient for a jury to conclude that a single conspiracy existed to distribute narcotics as alleged in Count One of the Third Superseding Indictment.  *See, e.g.*, *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000) ("A single conspiracy may be found where there is mutual dependence among the participants, a common aim or purpose or a permissible inference from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture."); *United States v. Cirillo*, 499 F.2d 872, 888 (1974) (holding that evidence that co–conspirators used narcotics code language supports a finding of a single conspiracy).

The evidence presented at trial was also sufficient to show that both Defendant Reyes and Defendant Daniels were members of this overarching conspiracy.  Cooperating witnesses testified that Defendants Reyes and Daniels were members of the Sex Money Murder gang (*see* Tr. at 429–30, 433, 979–80), and that they dealt crack cocaine and heroin out of 105/107 Johnson Street (*see id.* at 426–27, 448, 1068).  Defendants Reyes and Daniels also used gang terminology, such as "paper," "dog food," "schwammy," and "moon" when discussing the operations at 105/107 Johnson Street.  (*See, e.g.*, Exs. 49, 67, 71–72.)  The Government presented evidence that Daniels purchased narcotics for redistribution by other members of the gang—specifically, that he sold heroin to Defendant Reyes who in turn supplied the rest of the dealers at 105/107 Johnson Street.  (*See* Tr. at 473. 476; Exs. 72, 76–77, 93)  This evidence belies Defendant Daniels's argument that he did not have a "stake" in the conspiracy because he was actually a

source of supply for the street–level dealers in the gang, and his business therefore depended to some extent on their success.  There was also testimony that occasionally another individual would sell narcotics on Defendant Daniels's behalf (*see* Tr. at 614), and that he steered customers to 105/107 Johnson Street to purchase narcotics from other members of the gang (*see* Exs. 66–67).  One cooperating witness testified that Mr. Daniels and another gang member oversaw the drug operation at 105/107 Johnson Street.  (*See* Tr. at 502.)  Thus, the jury could have concluded that the testimony that Defendant Daniels did not spend as much time at 105/107 Johnson Street as the other co–conspirators was consistent with his role as a manager.  This evidence was sufficient for the jury to find that Defendants Daniels knowingly and willfully joined the conspiracy charged in Counts One and Two of the Third Superseding Indictment.

The jury also heard evidence that Defendant Reyes often supplied other gang members with the heroin and crack that they sold out of 105/107 Johnson Street (*see id.* at 473, 476), that he gave the residents of 105/107 Johnson Street free heroin in order to test the quality of the drugs (*see id.* at 453), that he blended and packaged heroin for sale out of 105/107 Johnson Street (*see id.* at 78), and that occasionally other members of the gang would sell narcotics on his behalf (*see id.* at 492–94, 1064.)  Furthermore, there was also evidence presented at trial based on which the jury could have inferred that Defendant Reyes oversaw the day–to–day operations at 105/107 Johnson Street.  For example, in one intercepted telephone conversation, a member of the gang called Mr. Reyes to report that another member of the gang had stolen his drugs.  (*See* Ex. 52:  "Listen my n*gga.  I'm sorry, I'm sorry I gotta do this right now.  I'm sorry, know what I'm saying?  That I gotta come to you while you're with our baby at the, at the pumpkin factory and all that no lie, and not for nothin' my n*gga, this n*gga Cuda, this n*gga stealing from us my n*gga.")

Defendant Reyes replied that he would come to 105/107 Johnson Street and discipline the alleged thief.  (*See id.*:  "Yo, soon as I bum out there I'm definitely 'bout to tell him 'bout some hard sh\*t, like yo, you finished my n\*gga.  You keep n\*gga work and sh\*t you dead.")  This evidence was sufficient for the jury to find that Defendants Reyes knowingly and willfully joined the conspiracy charged in Counts One and Two of the Third Superseding Indictment.

### 2.   *Reasonably Foreseeable Quantity of Drugs*

In order to sustain the jury verdict on Count One, the Government also had to prove that it was reasonably foreseeable to Defendants Reyes and Daniels that the charged conspiracy involved at least 280 grams of cocaine base and one kilogram of heroin.  *See United States v. Gonzalez*, 420 F.3d 111, 125 (2d Cir. 2005).  Both Defendants argue that the Government failed to establish that the conspiracy involved one kilogram or more of heroin.[1]  Defendant Daniels argues that even if the Government could prove that the conspiracy involved 280 grams or more of cocaine base and one kilogram or more of heroin, the evidence was insufficient to show that these quantities were attributable to him.  Defendant Reyes argues that because he was not a kilogram–quantity "drug kingpin," the sale of one kilogram or more of heroin was not the "object" of the conspiracy he joined and thus he could not have been convicted as charged.

---

[1]  Neither Defendant Reyes nor Defendant Daniels appears to challenge the quantity of crack cocaine involved in the conspiracy.  Cooperating witnesses testified that the members of the gang sold between eight and twenty–one "eight–balls" of crack cocaine per week.  (*See* Tr. at 752–53, 1025.) Each eight ball contains three and a half grams of crack cocaine.  (*See id.* at 666, 752.)  Thus, based on the low end of these estimates, it would have taken the co–conspirators only about ten weeks to sell 280 grams of crack cocaine.  The conspiracy was charged for the period from January 2010 to January 2011.  (*See* Third Superseding Indict. ¶¶ 1, 4.)

The evidence at trial, viewed in the light most favorable to the Government, was sufficient to show that the 105/107 Johnson Street drug trafficking operation involved at least one kilogram of heroin during the time period charged in the Third Superseding Indictment.  During trial, Agent Dinnan testified that a $10 bag of heroin contained 0.01 grams (*see* Tr. at 681), and Agent King testified that a $10 bag of heroin contained 0.03 grams (*see id.* at 162). However, the chemical analyses of the narcotics seized from the gang's customers showed that five $10 bags of heroin contained 0.25 grams, or an average of 0.05 grams of heroin per bag.  (*See id.* at 913–16; Ex. 248.)  Agent Dinnan also testified that a "brick" of heroin—i.e., 100 $10 bags—contains 5 grams of heroin, or an average of 0.05 grams per bag.  (*See* Tr. at 681–82.)  Cooperating witnesses testified that the gang sold between five and fifteen "bundles"—i.e., 10 $10 bags—every day.  (*See id.* at 455, 476, 1040).  Thus, at the high end, the gang sold 7.5 grams of heroin per day, and would have sold one kilogram within less than five months.

Despite Defendant Daniels's argument that he spent less time at 105/107 Johnson Street and thus would not have been able to foresee the full extent of the gang's drug sales, the jury heard testimony that Defendant Daniels purchased narcotics for redistribution by other gang members (*see* Exs. 72, 76–77, 93), and that he oversaw the operation at 105/107 Johnson Street (*see* Tr. at 502).  As discussed above, the jury could have inferred that the testimony that Defendant Daniels spent less time at 105/107 Johnson Street was consistent with his role as a manager, rather than an indication of his reduced involvement in the conspiracy.  Therefore, there was sufficient evidence from which the jury could have concluded that it was reasonably foreseeable to him, given the pace and volume of the gang members' drug dealing, that the conspiracy involved one kilogram or more of heroin and 280 grams or more of cocaine base, even though no one transaction

10

ever approached that quantity.  Similarly, the Government presented evidence that Defendant Reyes was present at 105/107 Johnson Street nearly every day (*see id.* at 436–437), and that he frequently supplied narcotics to other members of the gang (*see id.* at 473, 476).  Thus, there was sufficient evidence from which the jury could have concluded that it was reasonably foreseeable to Defendant Reyes that the conspiracy involved one kilogram or more of heroin and 280 grams or more of cocaine base.

Furthermore, as to Defendant Reyes's argument that it is improper to charge him with this narcotics conspiracy because he was not a large–quantity dealer and that he could not be deemed to have conspired to sell one kilogram of heroin solely via the aggregation of many smaller–quantity transactions, the Second Circuit has previously considered and rejected such arguments.  *See United States v. Pressley*, 469 F.3d 63, 65–66 (2d Cir. 2005) (finding that § 841 "specifically included within its focus those managers of the retail level traffic . . . because they keep the street markets going" and holding that a conspiracy "is an illegal agreement that may, and often does encompass an array of substantive illegal acts carried out in furtherance of the overall scheme.  Within the context of a conspiracy to distribute large amounts of narcotics, these subsidiary crimes may take the form of a series of smaller drug sales." (internal quotation marks and citations omitted)).  During closing arguments, counsel for Defendant Reyes argued several times to the jury that Defendant Reyes was not the type of kilogram–quantity dealer that is typically targeted in FBI investigations, and that it would have taken thousands of transactions to aggregate the large quantities charged in the Third Superseding Indictment, (*see* Tr. 1457, 1460–61), but the jury evidently was not persuaded.  It was proper for the jury to rely on the aggregation of these smaller–quantity sales based on evidence presented at trial that Defendant Reyes was a source of supply for

the other members of the conspiracy (*see id.* at 473. 476), and for dealers who sold narcotics at other locations (*see id.* at 454–55, 474).  Thus, while Defendant Reyes may not have been targeting kilogram–size transactions, there was evidence that he was more than just a street–level dealer in that he targeted transactions that involved larger than single–use quantities, and that as a supplier of other members of the conspiracy, his success depended to some extent on these other dealers entering into as many small–scale transactions as possible.

For the reasons discussed above, Defendants Reyes and Daniels have not met their heavy burden under Rule 29 of establishing that there was insufficient evidence upon which the jury could have relied to find them guilty, and thus a judgment of acquittal is not warranted in this case.

### B.    Motion for a New Trial

Defendant Reyes also moves for a new trial.  In his motion, Defendant Reyes reiterates his claim that there was insufficient evidence to convict him on any of the counts charged, and concludes that the jury's guilty verdict can therefore only be explained as the result of prejudice stemming from the inadvertent introduction at trial of testimony that he was involved in a shooting incident with another gang member.  This argument was previously raised in Defendant's oral motion for a mistrial, and rejected by this Court.  (*See* Order [Doc. # 540].)  The jury received a limiting instruction (*see* Tr. at 535–37) to disregard the testimony about the shooting incident between Defendant Reyes and a cooperating witness, and the Court has no basis for believing that the jury was unable to or did not follow this instruction, nor was this testimony "devastating" to the outcome of the trial.  *See United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) ("Where an inadmissible statement is followed by a curative instruction, the court must

assume that the jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant.")

Contrary to Defendant Reyes's claims, there was ample evidence presented at trial to establish his guilt as to each count of the Third Superseding Indictment.  Specifically, as is discussed above in Part II.A, the Government presented extensive evidence tending to show that Defendant Reyes joined a single conspiracy to distribute narcotics and to maintain 105/107 Johnson Street as a drug–involved premises, that the alleged conspiracy involved one or more kilograms of heroin and 280 or more grams of cocaine base, and that these quantities were reasonably foreseeable to Defendant Reyes as the object of the conspiracy which he had joined.  Furthermore, because the inadvertently admitted testimony involved evidence of gun possession, rather than the narcotics distribution operation at 105/107 Johnson Street, it is less likely that potential prejudice resulting from this evidence would have motivated the jury to convict Defendant Reyes on the counts unrelated to firearms.  Thus, Defendant Reyes's argument that a guilty verdict on Counts One and Two could only have been motivated by improper prejudice stemming from the inadmissible evidence regarding the shooting incident is without merit.

Defendant Reyes also argues that he could only have been found guilty of possessing a firearm as a convicted felon (Count Three) because the jury improperly considered the inadvertently admitted testimony regarding the incident in which he fired a gun at a cooperating witness during a fight.  Specifically, Defendant Reyes argues that the only evidence tying him to possession of the Taurus identified in the Third Superseding Indictment was the testimony of a cooperating witness who was not credible,

13

and who was contradicted by the testimony of another witness.   During trial Lakesha Bowles testified that she agreed to purchase a .40 caliber Taurus handgun for Defendant Reyes (*see* Tr. at 793–821; Exs. 58, 73, 97–98), and that she went to a gun store, Connecticut Firearms, where Defendant Reyes and another co–conspirator picked out weapons, and gave her money to purchase them (*see* Tr. at 793–94, 797–807).   They then went to several Wal–Mart stores to purchase ammunition for these guns, and when she dropped Defendant Reyes and his co–conspirator off at 105/107 Johnson Street, they took the two guns that had been purchased and most of the ammunition with them.   (*See id.* at 810–17.)

The owner of the gun store, Robert Rich, also testified during trial.   He stated that he had made suggestions to Ms. Bowles regarding which weapons to buy, and that Defendant Reyes did not appear to be leading her purchase.   (*See id.* at 728–29.)   While this partially contradicts Ms. Bowles's testimony, she also admitted during trial that she had signed a "straw purchase" form at the store verifying that she was the intended owner of the guns, thereby concealing the fact that the guns were actually intended for Defendant Reyes and his co–conspirator.   (*See* Ex. 216.)   Given the somewhat defensive tenor of Mr. Rich's testimony, and his incentive to limit his potential liability stemming from a straw purchase occurring at his establishment, the jury could have inferred that, after receiving this form, Mr. Rich turned a blind eye to whether Defendant Reyes had any role in the purchase, and concluded that Ms. Bowles's testimony was credible.   The weighing of Bowles's and Rich's testimony was for the jury, as the Second Circuit has recognized that "the proper place for a challenge to a witness's credibility is in cross–examination and in subsequent argument to the jury."   *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (internal quotation marks omitted).   Counsel for Defendant Reyes

challenged Ms. Bowles's credibility during his closing arguments (*see* Tr. at 1474–78), but the jury apparently rejected this challenge.  The Court does not view Ms. Bowles's testimony regarding the circumstances under which the firearm was purchased as so lacking in credibility that it should reject the jury's assessment of her testimony.  *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) ("It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility.  Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." (internal citations omitted)).  In addition to Bowles's testimony about purchasing the .40 caliber Taurus for Reyes, there was additional testimony by cooperating witness David Johnson that Defendant Reyes had possessed a .40 caliber weapon, which he eventually traded for another firearm. (*See* Tr. at 479–81, 484, 487; Exs. 94, 108.)  Thus, there was ample evidence presented at trial for the jury to conclude that Defendant Reyes had possessed the .40 caliber Taurus handgun as charged in the Third Superseding Indictment.

For the reasons discussed above, the potential bias from the inadvertently admitted evidence does not present such an extraordinary case that there is a real concern that an innocent man may have been convicted, and therefore the Court concludes that a new trial is not warranted.

**IV.**     **Conclusion**

For the foregoing reasons, Defendant Daniels's Motion [Doc. # 553] for a Judgment of Acquittal is DENIED, and Defendant Reyes's Motion [Doc. # 567] for a Judgment of Acquittal, and in the Alternative for New Trial is DENIED.


IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 19th day of February, 2013.

16